CARL S. HELLMANN *v.* SMITH-MAYFLOWER,
SMITH'S MOVING AND STORAGE
COMPANY, INC.

[No. 239, September Term, 1980.]

*Decided December 11, 1980.*

The cause was argued before THOMPSON, MOORE and LISS,
JJ.

*Melvin G. Bergman* for appellant.

*Charles L. Richards* for appellee.

Moore, J., delivered the opinion of the Court.

The storage company appellee received into its warehouse approximately 10,000 pounds of appellant's personal property in May, 1971. Four years later, on May 10, 1975, when storage charges were long overdue and exceeded $2,000, the company sold the property at public auction for $760. In June 1978, appellant filed a two million dollar lawsuit against the company, seeking compensatory and punitive damages for alleged breach of contract, conversion and fraud. The warehouseman counterclaimed for the balance due above the net proceeds of sale. After a two-day bench trial, the court (Latham, J.) found for the appellee in the principal action and awarded it a judgment for $1,338 on the counterclaim. The inevitable appeal is based upon alleged violations of the Uniform Commercial Code in connection with the sale. We affirm, for the reasons stated.

I

Carl S. Hellmann, appellant, a consulting engineer for more than thirty years, resided with his mother in a 21-room house on Jocelyn Street in the District of Columbia. In the spring of 1971, his mother decided to sell the house and Mr. Hellmann was confronted with the necessity of removing his belongings on very short notice — about two weeks. He called appellee, Smith-Mayflower, Smith's Moving and Storage Company, Inc. ("Smith's"),[1] and it was willing to accommodate him. Appellant had many years' experience in packing and packaging.[2] He himself packed more than 150 cartons with his goods but made no inventory of their contents. The cartons, together with a number of glass bookcases, "rosewood" shelves, cabinets, slide trays, 2 oscilloscopes and a generator, were picked up by a Smith's moving crew on May 25, 1971. A "Warehouse Receipt and Contract," signed by appellant and appellee's foreman, listed

1. Presumably he did so in response to appellee's slogan, "Dont Make a Move Without Calling Smith's."

2. Appellant testified that he wrote the packaging specifications for the Civil Aeronautics Administration of the United States Government.

all the individual cartons simply as cartons, a number of them having the prefix "sm.," presumably for "small." Under the caption, "Condition," all the cartons bore the abbreviation, "PBO," meaning "packed by owner." The shelves, bookcases and other items above mentioned were separately listed. The weight of the entire lot appears on the document as "10080."

No insurance was placed by Hellmann on his property nor was an "excess valuation" declared by him in the contract document entitled "Service-Order Invoice" which was also signed by Hellmann and the foreman.[3]

Appellant paid $236.80 to the foreman on May 25, 1971. With the exception of that payment and $300 in cash picked up at his apartment in Washington by Smith's at a much later date, no charges were ever paid by appellant, despite repeated requests. Periodic notices were sent to him that his property was to be sold at public auction because of the unpaid charges. Such sales were held by Smith's once or twice annually. Over the years, however, appellant "talked his way out." In telephone conversations with Arthur Clarendon Smith, Jr., an officer of appellee, he repeatedly succeeded in getting additional time by representing that a pending lawsuit in the Circuit Court for Montgomery

---

3. An examination of the contract reveals alternative means for a shipper (bailor) to place a value upon his goods for purposes of the warehouseman's liability. In conspicuous red type, the contract provides:

"The customer agrees that the company's liability per item including contents is 30¢ per lb., unless the customer declares excess valuation and pays the additional costs." (Emphasis added.)

Appellant did not declare a higher valuation for his goods nor did he sign on the line provided after the statement, "I agree that the Company's Liability per item including contents is 30¢ per pound." Furthermore, below the above provisions, also in red type, are two signature spaces following the statement, "[t]he above is hereby accepted by me and I agree to the terms and conditions set forth herein." On the line designated "Shipper's Signature," no signature appeared. Immediately below on the "Foreman's Signature" line was the signature of Braxton, the foreman handling the moving of Hellmann's goods. Hellmann's signature, however, did appear on the contract following a provision which stated that the moving covered by the contract was satisfactorily completed. At trial, he was reasonably certain that the signature was his.

County would yield funds with which to pay the delinquent charges.[4]

Hellmann's day of reckoning, however, ultimately arrived. After notice and advertising, the particulars of which are related *infra,* his goods and those of 39 other individuals were sold at public auction at Smith's plant in Alexandria, Virginia on May 10, 1975. The gross amount realized by the sale of the Hellmann lot was $760.

Appellant apparently took his time to determine the next move. On June 27, 1978,[5] he filed a three-count declaration against Smith's. In Count I, it was alleged that Hellmann "was the owner and collector of rare sets of books, reports, items and other property . . . in excellent condition"; that while it was stored at Smith's warehouse in Gaithersburg, Maryland, an agreement was entered into between Hellmann and the president of Smith's that "the storage bills would be paid as soon as the plaintiff received a monetary award in a previous suit and to have [*sic*] insurance placed on the stored property"; that this agreement had been breached by the sale of the property and that Hellmann had been "deprived of a valuable and irreplaceable collection of books, catalogs [*sic*], manuscripts, etc., and other valuable goods." A judgment for one million dollars was prayed.

Count II alleged that the sale was "commercially unreasonable," was made "fraudulently, maliciously, and with intent to injure the plaintiff" and that "as a result of defendant's conversion,[6] the plaintiff was damaged in the amount of one million dollars." Punitive damages in the

---

**4.** Ironically enough, Hellmann's pending action was against the Bethesda Transfer and Storage Company. Asked why he delayed enforcing his lien and postponed sales from auction to auction, Mr. Smith testified "[b]ecause I was hoping he would pay up and knowing that it was first — it was not good business to have to make a sale in case he would pay up. It was a calculated risk on my part that he would come forth and he was very persuasive and I believed him."

**5.** The statute of limitations was not raised by Smith's.

**6.** The allegation of a conversion is presumably referrable to Md. Com. Law Code Ann. § 7-210 (9) which provides in part that in case of *wilful* violation of the requirements for sale to enforce a warehouseman's lien, the warehouseman "is liable for conversion."

same amount were also prayed. The third count alleged a fraudulent representation that Hellmann would be allowed to keep his property in storage "for an indefinite period of time" and that Smith's "fraudulently, maliciously and wrongfully sold plaintiff's property in a commercially unreasonable manner despite plaintiff's reliance on said representation. . . ."

The court below, in an oral opinion, held that no agreement between Hellmann and Smith had been entered into, as alleged in Count I. With respect to Counts II and III, the court confined itself to the requirement of the Commercial Code, Art. 7-210 (2) (f), that newspaper advertisements of public sales to enforce a warehouseman's lien "must include a description of the goods." The court concluded that there had been compliance with the statute.

On appeal, three questions are presented:

1) Whether the trial court was clearly erroneous in ruling that the legal advertisements were sufficient under U.C.C. § 7-210 (2) (f).

2) Whether the trial court was clearly erroneous in ruling that the Auction Sale Notice to appellant was sufficient under U.C.C. § 7-210 (2) (c).

3) Whether the trial court was clearly erroneous in failing to find an agreement not to sell the stored goods.

## II

In Maryland, a warehouseman's statutory lien is conferred by Md. Com. Law Code Ann. § 7-209 (1) which provides, in part:

"(1) A warehouseman has a lien against the bailor on the goods covered by a warehouse receipt or on the proceeds thereof in his possession for charges for storage or transportation (including demurrage and terminal charges), insurance, labor,

or charges present or future in relation to the goods, and for expenses necessary for preservation of the goods or reasonably incurred in their sale pursuant to law."

Here, the existence of the lien is not challenged; the controversy arises out of the enforcement of the lien which is governed by § 7-210. Subsection (1) thereof pertains to goods stored by a merchant in the course of his business and makes "commercial reasonableness" the standard for foreclosure proceedings in all cases except non-commercial storage. As the Official Comment states:

"The latter [non-commercial storage] embraces principally storage of household goods by private owners; and for such cases the detailed provisions as to notification, publication and public sale, found in Section 33 of the Uniform Warehouse Receipts Act, are retained in subsection (2). The swifter, more flexible procedure of subsection (1) is appropriate to commercial storage."

The provisions of subsection (2), therefore, are controlling here:

"(2) A warehouseman's lien on goods *other than goods stored by a merchant in the course of his business* may be enforced only as follows:

(a) All persons known to claim an interest in the goods must be notified.

(b) The notification must be delivered in person or sent by registered or certified letter to the last known address of any person to be notified.

(c) The notification must include an itemized statement of the claim, a *description of the goods* subject to the lien, a demand for payment within a specified time not less than ten days after receipt of the notification, and a conspicuous statement that unless the claim is paid within that time the goods will be advertised for sale and sold by auction at a specified time and place.

(d) The sale must conform to the terms of the notification.

(e) The sale must be held at the nearest suitable place to that where the goods are held or stored.

(f) After the expiration of the time given in the notification, an advertisement of the sale must be published once a week for two weeks consecutively in a newspaper of general circulation where the sale is to be held. *The advertisement must include a description of the goods, the name of the person on whose account they are being held, and the time and place of the sale.* The sale must take place at least fifteen days after the first publication. If there is no newspaper of general circulation where the sale is to be held the advertisement must be posted at least ten days before the sale in not less than six conspicuous places in the neighborhood of the proposed sale." (Emphasis added.)

Appellant first attacks Smith's compliance with that portion of subsection (f) above which requires the newspaper advertisement to include a "description of the goods." The appellee placed advertisements in *The Washington Post* and *The Washington Star-News*.[7] The latter advertisement read in part:

"SMITH'S MOVING & STORAGE CO.,
INC.
611 South Pickett Street
Alexandria, Virginia, 22304

Auctioneer's sale of *personal effects, household goods, appliances, china, glass, silverware,* etc., for storage charges. Notice is hereby given that on Saturday, May 10, 1975, at 10:00 A.M., until all sold at PUBLIC AUCTION at 611 South Pickett Street, Alexandria, Virginia, to enforce lien for

---

7. Smith testified that in addition, advertisements in local papers were published and circulars were distributed to attract larger crowds to the auction.

storage charges, etc., due and unpaid, *all goods, paintings and personal effects* in storage with SMITH'S MOVING & STORAGE CO., INC., in the name of . . . ." (Emphasis added.)

A list of forty names followed in the above advertisement, one of which was that of the appellee, Carl Hellmann. It appeared three times in successive weeks on April 19, 26 and May 3, 1975. An identical advertisement twice appeared in *The Washington Post.*

The appellant contends that because his goods did not consist of household goods, appliances, china, glass and silverware, the advertisement did not conform to the requirements of § 7-210 (2) (f). He testified that his lot included approximately 3600 technical books, pamphlets and a "complete research facility" including laboratory equipment, a variety of machine tools and vacuum pumps, all of which he valued in excess of $150,000 or $200,000." [8] He also testified that in his telephone conversations over the years with Mr. Smith and other representatives of the storage company, he described the technical nature and value of his property.[9]

No Maryland cases, and few cases elsewhere, have dealt with the narrow issue of the sufficiency of a "description of the goods" in a newspaper advertisement of a sale to enforce

---

**8.** Other descriptions of the goods given in writing by Hellmann to Smith's in the years preceding the sale were not entirely consistent. For example, in a letter from Hellmann to Smith's dated October 30, 1973, he described his goods as "mainly comprising a lot of books, papers, and other personal items." Yet, in another letter, dated April 12, 1974, Hellmann states, "the goods which are stored with you are NOT simply junk or discards; they are quite valuable, both intrinsically and to me personally. An auction of these goods in this area and at this time will probably not bring an appreciable amount or percentage of their actual and true worth. This is so because they are not the ordinary type of goods, but are very specialized materials. As such, they will enjoy a realistic market only at certain places such as New York City or London, Berlin, etc., since these are the standard marketplace for such items."

**9.** Several cartons containing appellant's goods were opened by Smith's employees shortly before the auction sale, but after publication of the newspaper advertisements. The testimony reveals that the purpose of displaying the goods was to allow interested buyers an opportunity to inspect them. It is interesting to note that even after several cartons were opened, Smith's employees saw nothing unusual or scientific in nature except the technical books.

a warehouseman's lien. The obvious purpose of such a requirement is to "insure that those who might be interested in buying the items will be present at the sale." *Grundy v. Clark Transfer Co., Inc.,* 42 N.C. App. 308, 256 S.E.2d 732, 736 (1979). In *Maritime World Corp. v. Grefe Steel Warehouse Corp.,* 154 N.Y.S.2d 684 (1956), the court addressed the issue of whether there was an inadequate description of the goods in an advertisement which was required to be placed by a warehouseman before a sale of the goods pursuant to a prior comparable law, § 118 of the General Business Law. The Court concluded:

> "We believe the statute intended to require that the property to be sold be identified, that the advertisement contain 'enough information to alert buyers and invite competition' so that the storer will have 'the advantage of time, place and publicity' in the sale of the goods."

*Id.* at 688. *Accord, Webb v. Downes,* 93 Minn. 457, 101 N.W. 966 (1904).

After a careful examination of the testimony and exhibits in this case, we cannot find that the trial court erred in holding that the description of the goods in the newspaper advertisement satisfied the requirements of the statute. First we observe, however, that if the contract documents had been otherwise than as heretofore described, and had they contained a description of the technical nature of appellant's property as claimed by him in his testimony, our conclusion would have been otherwise. *See Grundy v. Clark Transfer Co., Inc., supra.* The facts and circumstances of this case are, to be sure, unique. Appellant himself is an engineer with a wide range of knowledge and experience, including technical knowledge in the area of packaging. The documents which he signed do not even remotely support his position that the storage included "a complete research facility" or 3600 technical books, many of them out of print and irreplaceable. He packed the goods, declared no unusual value, and failed to supply an inventory to the warehouseman. Telephone conversations with

representatives of the warehouseman, after he was substantially in arrears, do not make up the deficiency in the Warehouse Receipt and Contract to which resort was made by Smith's personnel when the time came to prepare an advertisement of the public auction of his goods.[10] To hold otherwise would be to impose upon the warehouseman, under the circumstances of this case, an altogether unjust and unreasonable burden.

## III

Appellant's second contention is that the auction sale notice sent to him by Smith's was insufficient under § 7-210 (2) (c) of the Uniform Commercial Code. That section provides:

> "(c) The notification must include an itemized statement of the claim, a *description of the goods* subject to the lien, a demand for payment within a specified time not less than ten days after receipt of the notification, and a conspicuous statement that unless the claim is paid within that time the goods will be advertised for sale and sold by auction at a specified time and place." (Emphasis added.)

Again, the only error alleged by Hellmann was in the description of the goods contained in the notification. The record discloses that a registered letter, dated March 21, 1975, was sent to Hellmann's last known address. It was a printed "Auction Sale Notice" and stated the charges due, gave notice of an upcoming auction sale if such charges were not paid by a certain date, and described the property as "various cartons, slide trays, glass front cabinet, glass book case, many misc. items. . . ." Below the above description was the routine printed language which stated, "[h]ousehold goods, personal effects, appliances, paintings, china, glass and silverware as itemized on Inventory *20192.*"

---

10. Roy Hansen, an officer of the company, testified in the proceedings in this connection: "Q . . . [D]id you also in preparing for these sales, look through the shipper's inventory? A Yes, that was looked at. Q And did you do that in this case? A Yes."

We think it plain that the "Auction Sale Notice" sufficiently described the goods for purposes of subsection (c). The description was more than adequate to put appellant on notice that his entire lot would be sold at auction if storage payments were not made. Appellant had but one lot in storage. No. 20192 was assigned to his entire lot and that number appeared on the "Auction Sale Notices." There was no reason for appellee to sell only a portion of Hellmann's goods in light of the increasing storage debt. Furthermore, appellant never objected to the same description contained in many prior notices. We, therefore, find no error.

## IV

Finally, appellant avers that the trial court was clearly erroneous in failing to find an agreement between the parties not to sell the stored goods until the termination of Hellmann's other lawsuit; and he also claims that because no termination date for the storage contract was given, the warehouseman was bound, under § 7-206 (1) to give Hellmann at least thirty days to pay his charges and remove his goods, instead of the twenty days notice provided.[11]

First, appellant's reliance on § 7-206 is misplaced. That provision is inapplicable in the instant case because the warehouseman chose to pursue his remedy under § 7-210 (2). We agree with the appellee that § 7-206 is an alternative remedy which *may* be pursued by the warehouseman in certain circumstances before resort to § 7-210. It is not appropriate to proceed under § 7-206 when a warehouseman elects to foreclose his statutory lien directly under § 7-210.

---

11. § 7-206 is entitled "Termination of storage at warehouseman's option." Subsection (1) reads as follows:

"(1) A warehouseman may on notifying the person on whose account the goods are held and any other person known to claim an interest in the goods require payment of any charges and removal of the goods from the warehouse at the termination of the period of storage fixed by the document, or, if no period is fixed, within a stated period not less than thirty days after the notification. If the goods are not removed before the date specified in the notification, the warehouseman may sell them in accordance with the provisions of the section on enforcement of a warehouseman's lien (§ 7-210)."

Second, after a careful review of the record, we find that the trial judge was not clearly erroneous in finding no separate agreement between the parties concerning the payment of the storage charges. The court had before it conflicting versions of the same transaction and chose to believe the appellee. Maryland Rule 1086.

*Judgment affirmed; costs to be paid by the appellant.*